Michael Witry, ISB #7960
**Intermountain Fair Housing Council**
4696 W Overland Rd, Ste 140
Boise, ID 83706
(208) 383-0695
Fax: (208) 383-0715
mwitry@ifhcidaho.org

Christopher Brancart, *pro hac vice*
Liza Cristol-Deman, *pro hac vice*
**Brancart & Brancart**
PO Box 686
Pescadero, CA 94060
(650) 879-0141
Fax: (650) 879-1103
cbrancart@brancart.com
lcristoldeman@brancart.com

*Attorneys for Plaintiffs*

## In the United States District Court

## for the District of Idaho

| | |
|---|---|
| **Robert LaRosa, Iva LaRosa, and Intermountain Fair Housing Council, Inc.** | Case No. 1:18-cv-384 |
| Plaintiffs, | |
| v. | |
| **River Quarry Apartments, LLC; Rafanelli & Nahas Management Corporation; Deanne Pirnie; Law Offices of Kirk A. Cullimore; and Kirk Cullimore;** | **Complaint** |
| Defendants. | |

Plaintiffs Robert LaRosa and Iva LaRosa, along with the Intermountain Fair Housing Council, sue River Quarry Apartments, LLC; Rafanelli & Nahas Management Corporation; Deanne Pirnie; Law Offices of Kirk A. Cullimore; and Kirk Cullimore for housing discrimination against people with disabilities. Plaintiffs allege that Defendants discriminate against people with disabilities by imposing unreasonable restrictions on the process to approve companion animals as a method of

1

ameliorating the effects of disabilities, and by making unlawful inquiries into the nature and severity of residents' disabilities with the purpose or effect of excluding or otherwise discriminating against people with disabilities.

## I. Jurisdiction and Venue

1. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 2201, and 2202, and 42 U.S.C. § 3613.

2. Venue is proper in this Court because the events or omissions giving rise to these claims occurred in the District of Idaho.

## II. The Parties

3. Plaintiff Robert LaRosa resides in Boise, Idaho. He served in the United States Navy from 1966 to 1969. As a result of his military service, Mr. LaRosa suffers from disabling health conditions including cancer, heart disease, and PTSD. His disabilities substantially limit several of his major life activities, including mobility, the ability to communicate and socialize with others, the ability to care for himself, and the ability to sleep. He receives treatment through the Department of Veterans' Affairs ("VA") health care network. He is a person with a disability pursuant to the Fair Housing Act, 42 U.S.C. § 3602(h).

4. Plaintiff Iva LaRosa is Mr. LaRosa's wife and primary caregiver. She resides with Mr. LaRosa and is a person associated with Mr. LaRosa pursuant to the Fair Housing Act.

5. Plaintiff Intermountain Fair Housing Council ("IFHC") is an Idaho nonprofit corporation with its principal place of business in Ada County, Idaho. The IFHC's mission is to ensure open and inclusive housing for all people. The IFHC's purpose is to advance equal access to housing for all persons without regard to race, color, sex, religion, national origin, familial status, gender identity,

sexual orientation, source of income, or disability[1]. The IFHC attempts to eradicate discrimination through education about the fair housing laws, housing information and referrals, and housing counseling and enforcement, including filing complaints under the Fair Housing Act.

6. Defendant River Quarry Apartments, LLC, is an Idaho limited liability corporation with its primary place of business in Boise, Idaho. Defendant River Quarry Apartments, LLC owns an apartment complex of the same name in Boise.

7. Defendant Rafanelli & Nahas Management Corporation is a California corporation with its principal place of business in Lafayette, California. Rafanelli & Nahas Management Corporation manages residential and commercial buildings in Contra Costa County, California, and in Boise, Idaho. Among those buildings are the River Quarry Apartments.

8. Defendant Deanne Pirnie is a resident of Idaho and was, at all times relevant to this complaint, an employee of Rafanelli & Nahas Management Corporation. She served as the manager at River Quarry Apartments. At all times relevant to this complaint, Ms. Pirnie acted as an agent of River Quarry Apartments, LLC, and of Rafanelli & Nahas Management Corporation.

9. Defendants River Quarry Apartments, LLC, and Rafanelli & Nahas Management Corporation are collectively referred to as the "River Quarry defendants."

10. Defendant Law Offices of Kirk A. Cullimore, LLC is a Utah limited liability corporation with its primary place of business in Draper, Utah. Presently, it employs four lawyers: Kirk Cullimore; Kirk Cullimore, Jr.; Derek Barclay; and Kyle Johnson.

11. Defendant Kirk Cullimore[2] is a resident of Surprise, Arizona. He owns, operates, and manages the Law Offices of Kirk A. Cullimore. Mr. Cullimore is sued in his personal capacity and as the

---

[1] The term "disability" is synonymous with the term "handicap" as it is used in the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*
[2] Both Kirk Cullimore and Kirk Cullimore, Jr., are affiliated with the Law Offices of Kirk A. Cullimore. Upon information and belief, Kirk Cullimore, not Kirk Cullimore, Jr., is the person who committed the discriminatory actions described in this complaint.

owner of the Law Offices of Kirk A. Cullimore, LLC. Mr. Cullimore is licensed to practice law in Utah, but not in Idaho. Mr. Cullimore has conducted trainings regarding the Fair Housing Act for the Utah Apartment Association, the Idaho Apartment Association, and the National Apartment Association. At all times relevant to this complaint, Mr. Cullimore acted as an agent of River Quarry Apartments, LLC, an agent of Rafanelli & Nahas Management Corporation; and an agent of the Law Offices of Kirk A. Cullimore.

12. Defendants Kirk Cullimore and the Law Offices of Kirk A. Cullimore, LLC, are collectively referred to as the "Cullimore defendants."

13. River Quarry Apartments is a "dwelling" within the meaning of 42 U.S.C. § 3602(b).

### III.  Introduction

14. Defendants, acting individually or in concert, have engaged in a pattern or practice of discrimination on the basis of disability in connection with the ownership or operation of dwellings. Defendants have pursued this pattern or practice of discrimination with the purpose or effect of excluding or limiting persons with disabilities. Defendants continue to engage in such a pattern or practice of discrimination so as to constitute a continuing violation. Defendants' unlawful acts include, but are not limited to:

   a. Discriminating against any person in the terms, conditions, or privileges of the rental of a dwelling because of a renter's handicap or the handicap of any person associated with the renter, 24 C.F.R. § 100.202(b);

   b. Making statements that express a preference for, limitation, or discrimination against people with disabilities, in violation of 42 U.S.C. § 3604(c);

   c. Inquiring into the nature or severity of handicap, in violation of 24 C.F.R. § 100.202(c);

  d. Refusing to make a reasonable accommodation in rules, policies, practices, or services when such accommodations may be necessary to afford a handicapped person equal opportunity to use and enjoy a dwelling, in violation of 42 U.S.C. § 3604(f) and 24 C.F.R. § 100.204(a);

  e. Coercing or interfering with a person in the exercise or enjoyment of, or on account of that person having exercised or enjoyed, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by the Fair Housing Act, in violation of 42 U.S.C. § 3617 and 24 C.F.R. § 100.400(b);

  f. Using different qualification criteria or procedures because of handicap, in violation of 42 U.S.C. § 3604(b) and 24 C.F.R. § 100.60(b)(4).

*A. The LaRosas Meet Sid*

15. As a result of PTSD and other disabilities, Robert La Rosa experiences anxiety and difficulty in social situations and in doing many daily activities.

16. In 2013, when living in Rathdrum, Idaho, the LaRosas began to care for their daughter's dog, a Chihuahua named Sid. Ms. LaRosa observed that Sid had a calming effect on Mr. LaRosa, and helped him become comfortable in social situations and other day-to-day activities. The LaRosas asked their daughter if they could keep Sid, and their daughter agreed.

17. Sid has lived continuously with the LaRosas since 2013.

18. On September 14, 2016, Mr. LaRosa spoke to his medical provider, nurse practitioner Marjorie Hill of the VA's North Idaho Community-Based Outpatient Clinic in Coeur d'Alene, Idaho. Mr. LaRosa told Hill that Sid was helping him cope with his disabilities. Hill agreed that Sid helped Mr. LaRosa and wrote a note on her prescription pad stating, "Please allow Mr. Larosa [sic]

to have companion dog[3] with him to help manage his post-traumatic stress disorder." She signed the note.

19. On October 10, 2016, the LaRosas temporarily moved to Boise and lived at the Silver Bay Apartments. Silver Bay Apartments does not normally allow pets without an additional deposit, but the LaRosas requested to bring Sid with them as an emotional support animal and presented Silver Bay Apartments with the note from Hill. The management at Silver Bay Apartments accepted the note written by Hill as proof of Mr. LaRosa's disability-related need for Sid, and allowed Sid to live with the LaRosas as an emotional support animal without paying the additional deposit.

20. The LaRosas ended their tenancy at Silver Bay Apartments on May 26, 2017, and returned to Rathdrum.

### B. The LaRosas Move to River Quarry

21. The LaRosas made a permanent move to Boise in August of 2017. They transferred Mr. LaRosa's VA medical file to the Boise VA Medical Center ("VAMC"), and began searching for places to live.

22. The LaRosas initially hoped to return to Silver Bay Apartments, but Silver Bay did not have any available units that met Mr. LaRosa's disability-related needs, so they searched elsewhere.

23. The LaRosas found an appropriate vacant unit at River Quarry Apartments. They wanted to live at River Quarry because there was a ground floor unit available, and because the rent was affordable for them. The LaRosas applied to live at River Quarry Apartments on August 30, 2017.

24. River Quarry Apartments normally charges additional fees for residents who own dogs. Because Sid is a companion animal, the LaRosas requested a reasonable accommodation to keep Sid

---

[3] The terms "companion dog," "emotional support animal," "assistance animal," and "companion animal" are synonymous.

without paying the additional fee. They provided River Quarry Apartments with a copy of Hill's note stating that Sid helped with Mr. LaRosa's PTSD along with the rental application.

25. On September 7, 2017, Shelby Pugsley, the assistant manager at River Quarry Apartments, sent the LaRosas an email reading:

> We have approved you based on our rental qualifications. We still need to process the approval of approving [sic] your assistance animal; I have attached the needed forms. There is a document for both of you to complete, named request for resident, and a document for your health care provider to complete named verification for medical provider. Please complete and return the attached documents as soon as possible and we can get everything set for you to sign your lease.

26. Pugsley attached two documents to her email. These documents were entitled "Animal Identification Form" and "Resident's Request for Assistance Animal." Both of these documents bear a logo and copyright symbol identifying "the Law Offices of Kirk A. Cullimore" as the holder of the copyright.

27. The form entitled "Resident's Request for Assistance Animal" required the LaRosas to fill in a blank next to the line, "The anticipated length of the disability is…" The LaRosas filled in the requested blank with the word, "Lifetime."

28. The LaRosas filled out the Animal Identification Form and the Resident's Request for Assistance Animal on September 7, 2017, and returned them to Ms. Pugsley via email. The LaRosas identified Dr. Andrew Wilper of the Boise VAMC as Mr. LaRosa's primary care physician. The LaRosas also included a copy of Hill's note regarding Mr. LaRosa's need for Sid to help with his PTSD.

29. Later on the same day, September 7, 2017, Ms. Pugsley emailed the LaRosas, stating, "Thank you so much for sending those documents over. We will need the verification document from Dr. Wilper prior to approving your request for the accommodation animal." Ms. Pugsley attached another form, entitled "Verification for Assistance Animal." The Verification for Assistance Animal form also bears the logo and copyright of the Law Offices of Kirk A. Cullimore. Although the

7

LaRosas had already provided verification of Mr. LaRosa's need for Sid in the form of Hill's note, the LaRosas requested that Dr. Wilper provide verification of Mr. LaRosa's disability-related need for Sid.

30. On September 12, 2017, Dr. Wilper wrote a letter, bearing his digital signature and the contact information for the Boise VAMC, stating, "I attest that you have been under my care since October 2016 to the present. I am familiar with your history and with the functional and coping limitations imposed by your emotional/mental health-related issues. In my opinion, an emotional support animal may help mitigate the symptoms you are currently experiencing." The LaRosas submitted Dr. Wilper's letter to River Quarry Apartments the same day.

31. The LaRosas did not hear anything from River Quarry Apartments after submitting Dr. Wilper's letter to River Quarry Apartments. The LaRosas moved in to River Quarry Apartments with Sid on September 19, 2017, one week after they submitted Dr. Wilper's letter.

### C.  *Cullimore Calls the VA*

32. Since at least 2015 and possibly before, during training events for the Utah Apartment Association, the Idaho Apartment Association, and the National Apartment Association, the Cullimore defendants have instructed landlords not to approve requests for assistance animals until a representative of the landlord has spoken directly to the person who verified the disability-related need for the animal.

33. Sometime between September 12, 2017, and September 27, 2017, Kirk A. Cullimore, acting on behalf of the River Quarry defendants, called Dr. Wilper's secretary, Kimberly Barker, and asked to speak to Dr. Wilper about Mr. LaRosa's request for a reasonable accommodation. Mr. Cullimore did not identify himself as an attorney. Because VA regulations and medical privacy laws prohibit medical providers from releasing information to third parties without a release form signed by the patient, Ms. Barker declined to speak to Mr. Cullimore.

34. On September 27, 2017, Deanne Pirnie, the manager of River Quarry Apartments, wrote a letter to the LaRosas, which states in pertinent part:

> We contacted your doctor at the VA. He refused to verify the information. They refused to even state that the letter was authentic. They stated that you, the patient, needed to provide them with further documentation and releases to provide the verification.
>
> As a consequence, we cannot yet approve your request for an assistance animal. You will need to contact your doctor at the VA and provide them with them [sic] information and documentation necessary for them to not only confirm the need for the animal but to discuss the letter and verify it with us.

35. In response to Ms. Pirnie's letter of September 27, 2017, the LaRosas obtained a copy of the VA's information release form. Mr. LaRosa signed the release on September 28, 2017. The release authorized VA representatives to speak to "Kirk Cullimore" for the purpose of "discuss[ing] 9/12/17 letter written by Dr. Wilper regarding Assistive Animal."

36. On October 2, 2017, Mr. Cullimore, acting on behalf of the River Quarry defendants, called the VAMC and spoke to Dr. Wilper. Mr. Cullimore did not identify himself as an attorney, and Dr. Wilper believed that Mr. Cullimore was a property manager. Mr. Cullimore told Dr. Wilper that, in Mr. Cullimore's opinion, Dr. Wilper's letter was "contradictory" because it did not clearly distinguish whether the dog was a support animal or a service animal.[4] Dr. Wilper told Mr. Cullimore that the dog was a support animal.

37. Mr. Cullimore asked Dr. Wilper about Mr. LaRosa's diagnosis. Dr. Wilper did not disclose the diagnosis, but he confirmed that Mr. LaRosa was a person with a disability. Mr. Cullimore asked Dr. Wilper how long Dr. Wilper had been treating Mr. LaRosa, and when Mr. LaRosa got the dog. Dr. Wilper told Mr. Cullimore that he would have to check his treatment records and that he didn't know when Mr. LaRosa got the dog. Dr. Wilper told Mr. Cullimore that he would follow up with

---

[4] The letter identified Sid as an "emotional support animal," and contained the sentence, "I want to emphasize that an emotional support animal is not a service animal, nor does an emotional support animal have the same legal status, protection, or freedom that is afforded 'service animals.'"

Mr. Cullimore after Mr. LaRosa's appointment on October 4, 2017. Because Dr. Wilper is the chief of staff at the VAMC and was very busy, Dr. Wilper told Mr. Cullimore to expect a delay.

38. On the following day, October 3, 2017, Ms. Pirnie wrote a letter to Robert LaRosa reading:

> We have been diligently attempting to resolve your request for an Assistance Animal. As you know, we have been in contact with your medical provider and he requested more information from you.
>
> Our most recent discussion with him has determined that you do not qualify under the Fair Housing Act for this accommodation. This determination was made by your medical provider. Because the letter he sent was vague, we contacted him to clarify the information. When given the two prong test requirements (that you must be handicapped as defined by the Fair Housing Act and there is a nexus between the handicap and the need for the animal), your medical provider declined to verify that you met the necessary standard.
>
> As a consequence, we cannot grant the requested accommodation. If we can further assist you, please let us know.

39. On October 4, 2017, Mr. LaRosa had an appointment with Dr. Wilper. He brought the Verification for Assistance Animal form to the appointment. Dr. Wilper filled out and signed the form. The LaRosas returned the form to the River Quarry defendants on the same day. Ms. Pirnie acted surprised to see the completed form and asked the LaRosas if Dr. Wilper had "changed his mind," or words to that effect.

40. Later on the same date, October 4, 2017, Mr. Cullimore, acting on behalf of the River Quarry defendants, called the Boise VAMC. He told Ms. Barker that he believed that Dr. Wilper's signature on the Verification for Assistance Animal form was forged. Ms. Barker told Mr. Cullimore that the signature was genuine. Mr. Cullimore asked Ms. Barker why Dr. Wilper "changed his mind" about the assistance animal. Ms. Barker told Mr. Cullimore that she didn't know and that Dr. Wilper was unavailable to speak to Mr. Cullimore. Mr. Cullimore asked Ms. Barker to have Dr. Wilper call him back. Mr. Cullimore did not identify himself as an attorney.

41. After the phone conversation on October 4, 2017, Ms. Barker sent an email to Dr. Wilper reading:

> Dr. Wilper,
>
> Mr. Kirk Cullamore (sp?) called to verify your signature. He was very unprofessional and rude when I told him you would be back in the office next week.
>
> He said that you stated you would not be able to sign something for another 30 days, yet he received something from you signed today, so he suspects it may be forged. He said that he needs to verify your signature and that you knew he would need to talk to you before he would allow the animal.
>
> His number is 801-631-4531.

42. On October 8, 2017, Dr. Wilper replied:

> I told him that I would not see the patient until later in the week, which I did, and confirmed that Mr. Larosa does indeed need a support animal for his PTSD. Hence, I signed the form that Mr. Larosa brought to me. The signature is not forged.
>
> Can you relay this message to Mr. Cullamore [sic]?

43. Ms. Barker contacted Mr. Cullimore and relayed the information requested by Dr. Wilper. On October 11, 2017, Ms. Barker memorialized her call with Cullimore in an email message to Dr. Wilper:

> I let Mr. Cullamore [sic] know exactly what you wanted me to tell him. He said that he wants you to call him and tell him why you changed your mind. He stated that you said "no" and now are saying "yes" and that sounds suspicious to him.

44. Ms. Pirnie issued an approval letter for Sid on October 13, 2017, nearly a month after the LaRosas made their initial request for accommodation.

45. The LaRosas were frustrated and insulted with the way River Quarry handled their request for accommodation. Based on this treatment, they moved out of River Quarry on or about February 16, 2018.

### D. IFHC Tests River Quarry

46. Concerned that Mr. Cullimore's actions may have violated Mr. LaRosa's rights, Dr. Wilper called IFHC on October 11, 2017. He reported that Mr. Cullimore, acting on behalf of the River

Quarry defendants, called his office repeatedly, insisted on speaking to Dr. Wilper, required Mr. LaRosa to execute an information release to allow Mr. Cullimore to speak to Dr. Wilper, rejected Mr. LaRosa's first two attempts to provide proof of need for his companion animal, and asked Dr. Wilper about the nature and extent of Mr. LaRosa's disability.

47. On October 12, 2017, on the advice of Dr. Wilper, Ms. LaRosa called IFHC to learn more about her rights and her husband's rights under the Fair Housing Act.

48. In response to the LaRosas' complaint, IFHC conducted Fair Housing testing at the River Quarry Apartments.

49. IFHC Tester 1126 called River Quarry Apartments on October 20, 2017, to ask about available apartments. She left a voice mail. Tester 1126 called River Quarry again on October 24, 2017, and spoke to Ms. Pugsley. Tester 1126 and Ms. Pugsley discussed available two-bedroom units and their amenities. Tester 1126 told Ms. Pugsley that she had a prescription from her medical provider for a companion animal, which she needed to help with a disability.

50. Through the course of multiple phone calls, Ms. Pugsley stated that the tester's prescription from her medical provider would not be sufficient. Ms. Pugsley stated that River Quarry Apartments would have to speak with the medical provider to verify the need for the animal. Tester 1126 stated that her doctor was working on rescue efforts in Puerto Rico and could not be reached. She asked if River Quarry Apartments could verify in another way, such as by speaking to the doctor's staff. Ms. Pugsley said she had checked with "corporate," and "corporate" said that they would have to speak to the doctor personally.

51. IFHC Tester 011696 called River Quarry on October 20, 2017 and spoke to Ms. Pugsley. Tester 011696 and Ms. Pugsley discussed available two-bedroom units and their amenities. Tester 011696 did not disclose the existence of any disabilities. Ms. Pugsley did not state any conditions under which the River Quarry defendants would ask to speak to Tester 011696's medical provider.

52. To counteract Defendants' discriminatory housing practices, IFHC planned and implemented an education and outreach program to reach members of the community and residents of River Quarry Apartments. Specifically, IFHC has conducted Fair Housing trainings with an emphasis on reasonable accommodations, printed an informational advertisement in the Idaho Statesman, and mailed informational flyers to residents of River Quarry. IFHC anticipates that additional programs and events will be necessary.

### E. *Injuries*

53. Defendants' actions directly and substantially injured the LaRosas by causing them to suffer a loss of civil rights and other damages, including lost housing opportunity, emotional distress with attendant physical symptoms, humiliation, and embarrassment. Accordingly, Robert LaRosa and Iva LaRosa are entitled to compensatory damages under the Fair Housing Act, 42 U.S.C. § 3613(c)(1).

54. Defendants' actions directly and substantially injured IFHC by diverting its resources to identify and counteract defendants' unlawful housing practices. Those resources could have been used to provide other services and conduct other educational activities, research, and policy advocacy instead of countering the Defendants' discriminatory conduct. Accordingly, IFHC is entitled to compensatory damages under the Fair Housing Act, 42 U.S.C. § 3613(c)(1).

55. Defendants' actions directly and substantially injured IFHC by frustrating its mission of advancing equal housing for all persons without regard to, among other things, disability.

56. In doing the acts of which Plaintiffs complain, defendant acted with reckless disregard of Plaintiffs' federally protected Fair Housing rights. Accordingly, Plaintiffs seek to recover punitive damages pursuant to the Fair Housing Act, 42 U.S.C. § 3613(c)(1).

57. There now exists an actual controversy between the parties regarding Defendants duties under federal and state laws. Accordingly, Plaintiffs are entitled to declaratory relief under 42 U.S.C. § 3613(c)(1), 28 U.S.C. §§ 2201-2202, and Rule 57 of the Federal Rules of Civil Procedure.

58. Unless enjoined, Defendants will continue to engage in the unlawful acts and the pattern and the practice of discrimination and unlawful conduct described in the complaint. Plaintiffs have no adequate remedy at law. They are now suffering and will continue to suffer irreparable injury as a result of Defendants acts of discrimination and unlawful conduct unless relief is provided by this Court. Accordingly, Plaintiffs are entitled to injunctive relief under the Fair Housing Act, 42 U.S.C. § 3613(c)(1), and Rule 65 of the Federal Rules of Civil Procedure.

**First Cause of Action**

(Fair Housing Act, 42 U.S.C. § 3601 *et seq.*)

59. Plaintiffs repeat and re-allege the foregoing paragraphs of their Complaint as though fully set forth herein.

60. Defendants injured Plaintiffs by committing discriminatory housing practices, in violation of the Fair Housing Act., 42 U.S.C. §§ 3604(c) and (f), and 3617.

**Second Cause of Action**

(Negligence)

61. Plaintiffs repeat and re-allege the foregoing paragraphs of their Complaint as if set forth fully herein.

62. Defendants had a duty to Plaintiffs. Defendants breached that duty and injured Plaintiffs by want of ordinary care or skill, in the management of their property, person, or agents.

**Third Cause of Action**

(Invasion of Privacy)

63. Plaintiffs repeat and re-allege the foregoing paragraphs of their Complaint as though fully set forth herein.

64. Defendants' actions constituted an intentional and unreasonable intrusion upon the Plaintiffs' private concerns or affairs.

65. Defendants injured Plaintiffs by intentionally and unreasonably intruding upon the Plaintiffs' private concerns or affairs.

## Relief Sought

*Wherefore,* Plaintiffs respectfully request that judgment be entered against Defendants as follows:

a. Declaring that Defendants' actions violate the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*;

b. Enjoining Defendants to make all necessary modifications to their policies and procedures to comply with the Fair Housing Act;

c. Enjoining Defendants to undergo training on the requirements of the Fair Housing Act;

d. Enjoining all unlawful practices alleged in this complaint and imposing affirmative injunctive relief requiring Defendants, their partners, agents, employees, assignees, and all persons acting in concert with or participating with them, to take affirmative action to provide equal housing opportunities to all persons regardless of their disabilities;

e. Awarding actual and punitive damages to Plaintiffs in amounts to be proven at trial;

f. Awarding reasonable attorneys' fees and costs to Plaintiffs, pursuant to 42 U.S.C. § 3613; and

g. Awarding such other relief as the Court deems just and proper.

## Jury Demand

Trial by jury is hereby demanded.

*Dated* this 29th day of August, 2018.

/s/

Michael Witry, ISB #7960

Intermountain Fair Housing Council

Attorney for Plaintiffs