# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROBERT LAROSA, IVA LAROSA, and INTERMOUNTAIN FAIR HOUSING COUNCIL, INC., <br><br> Plaintiffs, <br><br> v. <br><br> RIVER QUARRY APARTMENTS, LLC, RAFANELLI & NAHAS MANAGEMENT CORPORATION; DEANNE PIRNIE; LAW OFFICES OF KIRK A. CULLIMORE; and KIRK CULLIMORE, <br><br> Defendants. | Case No. 1:18-cv-00384-BLW <br><br> **MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Before the Court is Defendants River Quarry Apartments, LLC, Rafanelli & Nahas Management Corporation, and Deanne Pirnie's Motion to Dismiss (Dkt. 12). For the reasons explained below, the Court will grant the motion with leave to amend.

## BACKGROUND

From September 2017 through February 2018, plaintiffs Robert and Iva LaRosa lived in an apartment at River Quarry Apartments in Boise. During that entire time, Mr. LaRosa's support dog Sid lived with them in the apartment. The LaRosas nevertheless claim that defendants discriminated against them by "imposing unreasonable restrictions

on the process to approve companion animals . . . and by making unlawful inquiries into the nature and severity of residents' disabilities with the purpose or effect of excluding or otherwise discriminating against people with disabilities." *Compl.*, Dkt. 1, at 1.

   1. **Allegations Related to the LaRosas**

On August 30, 2017, the LaRosas applied to rent an apartment at the River Quarry Apartments. River Quarry typically changes additional fees for dog owners, but the LaRosas requested an accommodation to keep Sid as an emotional support animal. They provided River Quarry with a copy of a September 4, 2016 note from a nurse practitioner, which states: "Please allow Mr. Larosa to have a companion dog with him to help manage his post-traumatic stress disorder." *Id.* ¶ 18.

Roughly a week later, on September 7, 2017, the LaRosas received an email from River Quarry management stating, "We have approved you based on your rental qualifications." *Id.* ¶ 25. The email went on to state that "We still need to process the approval of approving [sic] your assistance animal." *Id.* The email instructed the LaRosas to complete two forms entitled (1) "Animal Identification Form," and (2) "Resident's Request for Assistance Animal."

The LaRosas completed and returned the forms the same day, identifying Dr. Andrew Wilper as Mr. LaRosa's primary care physician. River Quarry then asked Mr. LaRosa to have Dr. Wilper, complete a third form, titled "Verification for Assistance Animal."

Dr. Wilper did not complete this form; instead on September 12, 2017, he wrote a letter to Mr. LaRosa, which stated:

> I attest that you have been under my care since October 2016 to the present. I am familiar with your history and with the functional and coping limitations imposed by your emotional/mental health-related issues. In my opinion, an emotional support animal may help mitigate the symptoms you are currently experiencing.

*Id.* ¶ 30. The LaRosas provided this letter to River Quarry Apartments that same day (September 12), and on September 19 they moved into the apartment along with Sid.

At some point between September 12 and 27, 2017, Defendant Kirk Cullimore, an attorney acting on behalf of River Quarry Apartments, contacted Dr. Wilper's secretary, Kimberly Barker, regarding Mr. LaRosa. Ms. Barker declined to speak with Mr. Cullimore "[b]ecause VA regulations and medical privacy laws prohibit medical providers from releasing information to third parties without a release form signed by the patient, . . . ." *Id.* ¶ 33.

On September 27, 2017, Defendant Deanne Pirnie, the manager of River Quarry Apartments, informed the LaRosas that Dr. Wilper had refused to verify "the information" or "to even state that the letter was authentic." *Id.* ¶ 34. Ms. Pirnie informed the LaRosas that because of this, "we cannot yet approve your request for an assistance animal." ¶ 34. The LaRosas were told that they would "need to contact your doctor at the VA and provide them with them [sic] information and documentation necessary for them to not only confirm the need for the animal but to discuss the letter and verify it with us." ¶ 34. Mr. LaRosa then signed a release authorizing VA representatives to speak to Mr. Cullimore for the purposes of discussing the September 12, 2017 letter Dr. Wilper had written.

On October 2, Mr. Cullimore spoke with Dr. Wilper by telephone. Plaintiffs describe the call as follows:

> Mr. Cullimore asked Dr. Wilper about Mr. LaRosa's diagnosis. Dr. Wilper did not disclose the diagnosis, but he confirmed that Mr. LaRosa was a person with a disability. Mr. Cullimore asked Dr. Wilper how long Dr. Wilper had been treating Mr. LaRosa, and when Mr. LaRosa got the dog. Dr. Wilper told Mr. Cullimore that he would have to check his treatment records and that he didn't know when Mr. LaRosa got the dog. Dr. Wilper told Mr. Cullimore that he would follow up with Mr. Cullimore after Mr. LaRosa's appointment on October 4, 2017. Because Dr. Wilper is the chief of staff at the VAMC and was very busy, Dr. Wilper told Mr. Cullimore to expect a delay.

*Id.* ¶ 37.

The following day, October 3, 2017, Ms. Pirnie informed Mr. LaRosa that River Quarry could not grant the requested accommodation. The next day, however, Mr. LaRosa had an appointment with Dr. Wilper, and during that appointment, Dr. Wilper signed River Quarry's form. Mr. LaRosa then supplied the completed form to Ms. Pirnie.

Mr. Cullimore thought Dr. Wilper's signature might be forged, based on the fact that Dr. Wilper had previously told him there might be a long delay for him to sign forms, but then the LaRosas nonetheless had a signed form in hand just two days later. Given that, Mr. Cullimore contacted Dr. Wilper's office again (on October 4) and spoke to Ms. Barker. Mr. Cullimore said he believed the signature may have been forged and asked for verification.

Roughly a week later, on October 11, 2017, Ms. Barker, acting on Dr. Wilper's instruction, called Mr. Cullimore and told him that the signature was genuine and that Mr. LaRosa did indeed need a support animal for his PTSD. Mr. Cullimore expressed

reservations. He told Ms. Barker that Dr. Wilper initially "said 'no' and now [is] saying 'yes' and that sounds suspicious to him." ¶ 43.

Regardless, two days later Ms. Pirnie issued an approval letter for Sid. The LaRosas lived with Sid in their apartment at River Quarry the entire time they lived at the apartments – from September 19, 2017 until February 16, 2018. The LaRosas allege that they moved out of their apartment in February 2018 because they "were frustrated and insulted with the way River Quarry handled their request for accommodation." ¶ 45.

### 2. Allegations Related to Testers

After learning of the LaRosas experiences at River Quarry, Plaintiff Intermountain Fair Housing Council (IHFC) conducted testing at River Quarry Apartments with two different potential renters – Tester 1126 and Tester 011696.

In late October 2017, IHFC Tester 1126 called the apartments and indicated she had a prescription from her medical provider for a companion animal, which she needed to help with a disability. The assistant manager informed the tester that a prescription would not be sufficient; rather River Quarry would have to speak to a medical provider to verify the need for the animal. When the apartment manager was told that the doctor could not be reached (because the doctor was ostensibly in Puerto Rico working on rescue efforts), the apartment manager said River Quarry could not verify the need for a companion animal via the doctor's staff but would instead need to speak to the doctor personally. *See Compl.* ¶ 48-50.

The second tester, identified as Tester 011696, called River Quarry around the same time and asked about available two-bedroom apartments. This tester did not

disclose the existence of any disabilities, and the manager "did not state any conditions under which River Quarry would ask to speak to Tester O11696's medical provider." *Id.* ¶ 51.

As noted above, the LaRosas moved out of River Quarry in February 2018. They filed this lawsuit, along with plaintiff IHFC, in August 2018. Plaintiffs allege three claims: (1) violation of the Fair Housing Act; (2) negligence; (3) invasion of privacy.

## GOVERNING LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While a complaint attacked by a Rule 12(b)(6) motion to dismiss "does not need detailed factual allegations," it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.*

The Supreme Court identified two "working principles" that underlie Twombly in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). First, the court need not accept legal conclusions that are couched as factual allegations as true; the trial court "can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id*. Rule 8 does not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id*. at 678-79. Second, to survive a motion to dismiss, a complaint must state a plausible claim for relief. *Id*. at 679. "Determining whether a complaint states a plausible claim for relief will ... be a context-

specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

A dismissal without leave to amend is improper unless it is beyond doubt that the complaint "could not be saved by any amendment." *Harris v. Amgen, Inc.*, 573 F.3d 728, 737 (9th Cir. 2009). The Ninth Circuit has held that "in dismissals for failure to state a claim, a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe, Inc. v. Northern California Collection Service, Inc.*, 911 F.2d 242, 247 (9th Cir. 1990). The issue is not whether plaintiff will prevail but whether he "is entitled to offer evidence to support the claims." *See Hydrick v. Hunter*, 466 F.3d 676, 685 (9th Cir. 2006).

## ANALYSIS

### A. Fair Housing Act Claims

Plaintiffs allege that defendants violated three separate provisions of the Fair Housing Act: § 3604(f); § 3604(c); and § 3617. Broadly speaking, § 3604(f) prohibits housing providers from failing to reasonably accommodate a disability; § 3604(c) deals with discriminatory statements; and § 3617 deals with retaliation. The Court will address each aspect of plaintiffs' FHA claim in turn.

Section 3604(f)(2) of the Fair Housing Act forbids discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap . . . ." 42 U.S.C. § 3604(f)(2). "Such discrimination includes a refusal to make reasonable

accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." *Overlook Mutual Homes, Inc. v. Spencer*, 415 Fed. App'x 617, 620-21 (6th Cir. 2011) (quoting 42 U.S.C. § 3604(f)(3)(B)). To prove that a housing provider failed to reasonably accommodate a disability, a plaintiff must prove that: (1) she suffers from a disability within the meaning of FHA; (2) the defendant knew or reasonably should have known of the disability; (3) the requested accommodation may be necessary to afford "an equal opportunity to use and enjoy the dwelling;" (4) the accommodation is reasonable; and (5) the defendant refused to make the accommodation. *DuBois v. Ass'n. of Apt. Owners of 2987 Kalakaua*, 453 F.3d 1175, 1179 (9th Cir. 2005).

All defendants except Mr. Cullimore and his law firm contend that plaintiffs' Fair Housing Act claim under § 3604(f) fails as a matter of law because plaintiffs cannot satisfy the fifth element – that a housing provider refused to make an accommodation. The Court agrees. As noted, Sid lived with plaintiffs during their entire stay at the River Quarry apartments, and they were granted a formal accommodation roughly one month after they moved in and nine days after they completed the landlord's verification form. There are no allegations that the LaRosas were threatened with eviction or removal of the animal, or that they were otherwise fined or punished because Sid lived in the apartment. Under these facts, plaintiffs have failed to allege an essential element of their claim under 42 U.S.C. § 3604(f).

The Ninth Circuit addressed a somewhat similar situation in *DuBois v. Ass'n of Apt. Owners of 2987 Kalakaua*, 453 F.3d 1175, 1179 (9th Cir. 2005). In that case,

DuBois and Prindable owned a unit in a residential condominium project and they began living with an English bulldog. Condominium bylaws forbade animals on the premises, "except that qualified individuals with disabilities" were allowed to have "assistance animals." In an effort to satisfy the bylaws, DuBois and Prindable submitted letters recommending that one or the other be allowed to keep the animal for "medical reasons." The condominium managers requested more information about the alleged conditions, but none of the doctors responded. DuBois and Prindable took the position that neither they nor their physicians were obligated to disclose further information, but they eventually submitted letters from a behavioral medicine specialist and two doctors stating that Prindable suffered from depression and that he would benefit from animal-assisted therapy and that separation from the dog would exacerbate the condition.

 The condominium association granted plaintiffs temporary permission to keep the dog, pending its review of the submissions concerning Prindable's condition. Before the condominium association took any further action to evict the dog, DuBois and Prindable sued. They alleged discrimination and retaliation in violation of the FHA, among other claims. The district court granted summary judgment in favor of the condominium association, and the Ninth Circuit affirmed, explaining that "[s]ince the Condominium Association never refused to make the requested accommodation, plaintiffs' FHA claim necessarily failed." *Id.* at 1179 (footnote omitted, *citing Bryant Woods Inn, Inc. v. Howard County*, 124 F.3d 597, 602 (4th Cir.1997) ("[A] violation [of the FHA] occurs when the disabled resident is first denied a reasonable accommodation....")).

The difference here is that, unlike Dubois and Prindable, the LaRosas were never granted a formal, temporary exemption to River Quarry's rules regarding pets. But more importantly, Sid was allowed to stay in the apartment with the LaRosas. The LaRosas were never required to leave the apartment; they were never charged a pet deposit; and they were never otherwise charged, fined, or punished for having Sid in the apartment.

The Sixth Circuit addressed similar situation *Overlook Mutual Homes, Inc. v. Spencer*, 415 Fed. App'x 617, 620-21 (6th Cir. 2011) (unpublished decision). There, the court affirmed the district court's granting of a motion for judgment as a matter of law in favor of a housing corporation. The housing corporation did not formally grant the plaintiffs a temporary exemption to a "no pets" policy but nonetheless allowed plaintiffs to say in the home with the animal while considering the accommodation. *See id.* ("True, Overlook never granted the Spencers a temporary exemption from the "no pets" policy, but the more important fact is that Scooby was allowed to stay with the family, and they were never required to leave their home or otherwise punished for Scooby's presence."). As in *Overlook*, this Court concludes that although the LaRosas were not accorded a formal, temporary accommodation, they nonetheless enjoyed precisely that. Under *Dubois*, then, plaintiffs' allegation that River Quarry refused an accommodation fails as a matter of law.

Likewise, the Court is not persuaded that plaintiffs have alleged facts supporting a constructive denial. On this point, the LaRosas point to the delay between the time they first asked for an accommodation (August 30, 2017) and the date the accommodation was formally granted (October 13, 2017). As a general rule, landlords cannot avoid FHA suits

by delaying a decision on requests for an accommodation. "[A] housing provider that refuses to make a decision ... could be found to have constructively denied the request by 'stonewalling' and short-circuiting the [interactive] process." *Overlook*, 415 Fed. Appx. at 621. Further, "injury may result when a housing provider unreasonably delays responding to a request for accommodation and ... such delay may amount to a denial." *Id*. at 622; *see also Sabal Palm Condo. of Pine Island Ridge Ass'n, Inc. v. Fischer*, 6 F.Supp.3d 1272, 1293 (S.D. Fla. 2014) ("[C]ontinuing to delay for months and asking for even more information amounts to a constructive denial.").

    Those cases, however, are distinguishable. In the cited constructive-denial cases, a resident/applicant is typically left in limbo for lengthy periods of time while the landlord stonewalls. For example, in *Bhogaita v. Altamonte Heights Condominium Ass'n, Inc.* 756 F.3d 1277 (11th Cir. 2014), a condominium association sat on an accommodation request for six months. The association had all the information it needed and although it claimed it was still undertaking a meaningful review, that assertion found no support in the record. The district court thus granted summary judgment in plaintiff's favor. The association also was skeptical of the accommodation request and asked for far more than information it needed to determine that the tenant had a disability and a disability-related need for a support animal. Specifically, the defendants sent a letter to plaintiff's doctor seeking "additional information regarding Bhogaita's treatment, medications, and the number of counseling sessions he attended per week; details about how the diagnosis was made; whether the condition was permanent or temporary; and 'details of the prescribed treatment moving forward.' " *Bhogaita*, 2012 WL 6562766, at *7.

MEMORANDUM DECISION AND ORDER - 11

Not surprisingly, the Eleventh Circuit concluded that information being requested exceeded what was necessary and that the housing association had constructively denied the accommodation request. 756 F.3d at 1287.

Here, the LaRosas argue that their situation is similar because, at any point during the application process, River Quarry had everything it needed to grant the accommodation. The Court does not agree; under plaintiff's logic, a housing provider would have no choice but to accept a somewhat-dated letter indicating the need for an accommodation request (the letter the LaRosas initially provided was dated eleven months earlier) and any attempt to track down a current medical-care provider, or to contact that provider for the purpose of verifying a letter, would amount to constructive denial – even if the applicant was allowed to keep the animal during the time taken to verify the physician's stated need for a support animal. The case law does not support such a result.

Further, plaintiffs assert that defendants asked invasive questions, but there are no specific factual allegations supporting that assertion. Mr. Cullimore asked to confirm the diagnosis, the need for a dog, how long the doctor had been treating Mr. LaRosa, and how long LaRosa had had the dog. These facts do not support a constructive-denial claim, nor do they support plaintiffs' claim that River Quarry retaliated against them or made discriminatory statements. *See* 42 U.S.C. §§ 3604(c), 3617. Finally, plaintiffs allegations regarding the two testers' inquiries about renting an apartment do not offer any further factual support for any of plaintiffs' alleged claims.

B.  **Negligence**

The parties agree that the plaintiffs' negligence claim rises and falls with the FHA claim. *See Opp.*, Dkt. 15, at 18 (plaintiff states that "River Quarry correctly states that a Fair Housing plaintiff may bring a derivative claim for negligence when they are harmed by a defendant's lack of ordinary care and skill in managing their property."). Thus, because plaintiffs' FHA claim fails, their derivative negligence claim fails as well.

C.  **Invasion of Privacy**

Plaintiffs have also failed to allege a claim for invasion of privacy under Idaho law. In Idaho, "liability for a claim of invasion of privacy requires (1) an intentional intrusion by the defendant; (2) into a matter, which the plaintiff has a right to keep private; (3) by the use of a method, which is objectionable to the reasonable person." *Jensen v. State*, 72 P.3d 897, 902 (Idaho 2003). Because the right of privacy is measured by the reasonable person standard, "[t]he right of privacy is relative to the customs of the time and place, and is determined by the norm of the ordinary person." *Id.* (citation omitted). Thus, "in order to constitute an invasion of privacy, an act must be of such a nature as a reasonable person can see might and probably would cause mental distress and injury to anyone possessed of ordinary feelings and intelligences, situated in like circumstances as the plaintiff." *Id.* Further, it is not necessary to prove the presence of malice, and consent is a complete defense. *Id.* (citations omitted).

Here, the LaRosas allege that the Plaintiffs signed a release for River Quarry to speak to Dr. Wilper and thus consented to the release of information needed to verify the validity of their request for a reasonable accommodation. Further, plaintiffs' factual

allegations do not support their assertion that Mr. Cullimore sought information beyond that necessary to evaluate the accommodation request.

Although the Court has some reservation as to whether the deficiencies identified above can be adequately addressed in an amended complaint, it will grant the plaintiffs leave to amend. If the amended complaint does not address the issues discussed in this decision, defendants may renew their motion to dismiss, relying largely or even exclusively, on the briefing previously submitted.

## ORDER

**IT IS ORDERED** that Defendants River Quarry Apartments, LLC, Rafanelli & Nahas Management Corporation, and Deanne Pirnie's Motion to Dismiss (Dkt. 12) is **GRANTED WITH LEAVE TO AMEND.**

**IT IS FURTHER ORDERED** that plaintiffs may file an amended complaint within 21 days of this Order.

DATED: March 4, 2019

_____
B. Lynn Winmill
U.S. District Court Judge