UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROBERT LAROSA, IVA LAROSA, and INTERMOUNTAIN FAIR HOUSING COUNCIL, INC., | Case No. 1:18-cv-00384-BLW |
| Plaintiffs, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| RIVER QUARRY APARTMENTS, LLC, RAFANELLI & NAHAS MANAGEMENT CORPORATION, DEANNE PIRNIE, LAW OFFICES OF KIRK A. CULLIMORE, and KIRK CULLIMORE, | |
| Defendants. | |

## INTRODUCTION

Plaintiffs filed this action in August 2018, alleging that defendants violated their rights under the Fair Housing Act. Plaintiffs' central allegation was that defendants wrongfully denied Robert LaRosa's request for a reasonable accommodation allowing his companion dog, Sid, to live with him in his apartment. In March 2019, the Court dismissed the complaint, reasoning that because Sid had lived with the LaRosas during their entire tenancy at River Quarry Apartments, there had been no FHA violation. *See Mem. Decision & Order,* Dkt. 31.

The plaintiffs have now filed an amended complaint. The amended complaint names the same defendants – River Quarry Apartments, LLC; Rafanelli & Nahas Management Corporation; Deanne Pirnie; attorney Kirk A. Cullimore; and the Law Offices of Kirk A. Cullimore. All defendants have moved to dismiss the amended complaint. *See* Dkts. 33, 34. For the reasons explained below, the Court will again dismiss plaintiffs' disparate treatment claim as well as their claim that defendants denied their request for a reasonable accommodation under the Fair Housing Act. The Court will, however, allow plaintiffs' interference and negligence claims to proceed.

## FACTS

Plaintiffs reallege many of the same facts in their amended complaint. Those facts will be described here, alongside the new factual allegations. The Court will not, however, detail the new allegations in the amended complaint that consist solely of argument, legal conclusions, or quotations from the Joint Statement issued by DOJ and HUD in this section.[1] *See, e.g., Am. Compl.*, Dkt. 32, ¶¶ 15-18, 34, 43, 46, 57, 64.

The factual allegations in the amended complaint fall into three main categories: (1) allegations related to Mr. LaRosa's efforts to obtain a reasonable accommodation at River Quarry Apartments; (2) allegations related to plaintiff Intermountain Fair Housing Council (IHFC) testers; and (3) allegations related to attorney defendant Kirk Cullimore's legal practice.

---

[1] *See* Joint Statement of The Department of Housing and Urban Development (HUD) and the Department of Justice (DOJ): Reasonable Accommodations Under the Fair Housing Act (2004) (available at https://www.hud.gov/sites/documents/huddojstatement.pdf) (last visited August 2, 2019).

1.     **Allegations Related to the LaRosas**

On August 30, 2017, Plaintiffs Robert and Iva LaRosa applied to live at River Quarry Apartments. *Am. Compl.*, Dkt. 32, ¶ 39. River Quarry typically charges additional fees for residents who own dogs, but the LaRosas requested a reasonable accommodation to keep their dog, Sid, without paying the fee. *Id.* ¶ 40. The LaRosas provided River Quarry with a copy of a September 2016 note from a nurse practitioner, stating: "Please allow Mr. Larosa (sic) to have a companion dog with him to help manage his post-traumatic stress disorder." *Id.* ¶¶ 34, 40.

Roughly a week later, on September 7, 2017, the LaRosas received an email from River Quarry management approving their residence application. *Id.* ¶ 41. Regarding the reasonable accommodation request for Sid, the email said, "We still need to process the approval of approving (sic) your assistance animal." *Id.* The email further instructed the LaRosas to complete two forms entitled (1) "Animal Identification Form," and (2) "Resident's Request for Assistance Animal." *Id.* ¶¶ 41-42. The second form requested information about "the anticipated length of the disability." *Id.* ¶ 43. Both documents included a logo and copyright symbol for "The Law Offices of Kirk A. Cullimore." *Id.* ¶ 42.

On the same day they received the forms, the LaRosas completed and returned them to River Quarry. *Id.* ¶ 44. They again submitted the 2016 nurse practitioner note which said: "Please allow Mr. Larosa (sic) to have a companion dog with him to help manage his post-traumatic stress disorder." *Id.* ¶¶ 34, 44. On one of the forms, Mr. LaRosa identified his primary care physician as Dr. Andrew Wilper at the Boise

Veterans Affairs Medical Center (VAMC). *Id.* ¶ 44. River Quarry then asked Mr.

LaRosa to have Dr. Wilper complete a third form, titled "Verification for Assistance

Animal." *Id.* ¶ 45. This form also included a logo and copyright symbol for "The Law

Offices of Kirk A. Cullimore." *Id.* Dr. Wilper did not initially complete the form;

instead, on September 12, he wrote a letter to the LaRosas bearing his digital signature,

which said:

> I attest that you have been under my care since October 2016 to the
> present. I am familiar with your history and with the functional and
> coping limitations imposed by your emotional/mental health-related
> issues. In my opinion, an emotional support animal may help mitigate
> the symptoms you are currently experiencing.

*Id.* ¶ 46. The LaRosas provided Dr. Wilper's letter to River Quarry on the same day. *Id.*

One week later, on September 19, the LaRosas moved into River Quarry with Sid. *Id.* ¶

47.

Sometime between September 12 and September 27, Mr. Cullimore called Dr.

Wilper's secretary, Kimberly Barker. *Am. Compl.*, Dkt. 32, ¶ 50. Mr. Cullimore asked to

speak directly to Dr. Wilper about Mr. LaRosa's request for a reasonable

accommodation. *Id.* Ms. Barker declined to speak to Mr. Cullimore further without a

release form signed by Mr. LaRosa. *Id.* On September 27, defendant Dianne Pirnie,

manager at River Quarry, wrote this letter to the LaRosas:

> We contacted your doctor at the VA. He refused to verify the information.
> They refused to even state that the letter was authentic. They stated that
> you, the patient, needed to provide them with further documentation and
> releases to provide the verification.
>
> As a consequence, we cannot yet approve your request for an assistance
> animal. You will need to contact your doctor at the VA and provide them

with them (sic) information and documentation necessary for them to not only confirm the need for the animal but to discuss the letter and verify it with us.

*Id.* ¶ 51.

Mr. LaRosa signed a release form on September 28 authorizing VA representatives to speak to "Kirk Cullimore" for the purpose of "discuss[ing] 9/12/17 letter written by Dr. Wilper regarding Assistive (sic) Animal." *Id.* ¶ 55.

On October 2, Mr. Cullimore spoke with Dr. Wilper by telephone. *Id.* ¶ 56. Plaintiffs describe the salient points of that call as follows:

- "Mr. Cullimore told Dr. Wilper that, in Mr. Cullimore's opinion, Dr. Wilper's letter was "contradictory" because it did not clearly distinguish whether the dog was a support animal or a service animal." *Id.* (footnote omitted). Plaintiffs allege that Mr. Cullimore raised this topic to confuse Dr. Wilper, or to "intimidate Dr. Wilper into withdrawing his medical verification." *Id.*

- During the call, "Mr. Cullimore also asked Dr. Wilper about Mr. LaRosa's diagnosis. Dr. Wilper did not disclose the diagnosis, but he confirmed that Mr. LaRosa was a person with a disability. Mr. Cullimore asked Dr. Wilper how long Dr. Wilper had been treating Mr. LaRosa, and when Mr. Larosa got the dog." *Id.* ¶ 57. Plaintiffs say Mr. Cullimore asked these particular questions "to force Dr. Wilper to spend additional time reviewing his medical records or meeting with Mr. LaRosa, and ultimately discourage or delay Dr. Wilper in confirming his medical verification, and more broadly, to cause Dr. Wilper to refrain from assisting people with disabilities in requesting

reasonable accommodations in the future, including those who need an assistive animal in their housing." *Id.* ¶ 58.

- In response to Mr. Cullimore's inquiries, "Dr. Wilper told Mr. Cullimore that he would follow up with Mr. Cullimore after Mr. LaRosa's appointment on October 4, 2017. Because Dr. Wilper is the chief of staff at the VAMC and was very busy, Dr. Wilper told Mr. Cullimore to expect a delay." *Id.* ¶ 59.

On the following day, October 3, Ms. Pirnie wrote a letter to Mr. LaRosa which read:

> We have been diligently attempting to resolve your request for an Assistance Animal. As you know, we have been in contact with your medical provider and he requested more information from you.
>
> Our most recent discussion with him has determined that you do not qualify under the Fair Housing Act for this accommodation. This determination was made by your medical provider. Because the letter he sent was vague, we contacted him to clarify the information. When given the two prong test requirements (that you must be handicapped as defined by the Fair Housing Act and there is a nexus between the handicap and the need for the animal), your medical provider declined to verify that you met the necessary standard.
>
> As a consequence, we cannot grant the requested accommodation. If we can further assist you, please let us know.
>
> As you know we do allow pets. You can come into the office and apply to have a pet addendum that would allow you to peek (sic) an approved animal. Of course, there are fees, deposits and rent that will be required for a pet.

*Id.* ¶ 60.

The next day, October 4, Mr. LaRosa had an appointment with Dr. Wilper. *Id.* ¶ 62. At the appointment, Dr. Wilper completed and signed the "Verification for

Assistance Animal" form that River Quarry had provided to Mr. LaRosa on September 4. *Id.* The LaRosas returned the form to Ms. Pirnie the same day. *Id.* Ms. Pirnie acted surprised to see the completed form and asked the LaRosas if Dr. Wilper had "changed his mind." *Id.*

Later that same day, Mr. Cullimore again called the Boise VAMC and spoke with Ms. Barker. *Amend. Compl.* ¶ 63. Mr. Cullimore told Ms. Barker that he believed Dr. Wilper's signature on the "Verification for Assistance Animal Form" was forged. *Id.* Ms. Barker said that the signature was genuine. *Id.* Mr. Cullimore asked why Dr. Wilper had "changed his mind" and asked Ms. Barker to have Dr. Wilper call him back. *Id.* Following the phone conversation, Ms. Barker sent an email to Dr. Wilper:

> [Mr. Cullimore] said that you stated you would not be able to sign something for another 30 days, yet he received something from you signed today, so he suspects it may be forged. He said that he needs to verify your signature and that you knew he would need to talk to you before he would allow the animal.

*Id.* ¶ 65.

> On October 8, Dr. Wilper replied:

> I told him that I would not see the patient until later in the week, which I did, and *confirmed* that Mr. Larosa (sic) does indeed need a support animal for his PTSD. Hence, I signed the form that Mr. Larosa brought to me. The signature is not forged.

> Can you relay this message to Mr. Cullamore (sic)?

*Id.* ¶ 66. Ms. Barker relayed the information to Mr. Cullimore and memorialized the call in an October 11 email to Dr. Wilper:

> I let Mr. Cullamore (sic) know exactly what you wanted me to tell him. He said that he wants you to call him and tell him why you changed your

mind. He stated that you said "no" and now are saying "yes" and that
sounds suspicious to him.

*Id.* ¶ 67. Plaintiffs do not allege that Dr. Wilper ever placed a return call to Mr.

Cullimore. Regardless, two days later, on October 13, Ms. Pirnie issued an approval

letter for Sid. *Id.* ¶ 70.

The LaRosas moved out of River Quarry on or about February 16, 2018, alleging

that "[t]heir experience during the reasonable accommodation review process caused

them to feel embarrassed, untrusted, humiliated and unwelcome." *Id.* ¶ 71.

**2.      Allegations Related to IHFC Testers**

After learning of the LaRosas' experiences at River Quarry, plaintiff IFHC

conducted fair housing tests targeting River Quarry. *Am. Compl.*, Dkt. 32, ¶ 74. Two

different testers posed as potential renters and called River Quarry on October 20, 2017.

IFHC Tester 1126 called River Quarry and left a voicemail inquiring about

available apartments. *Id.* ¶ 75. Tester 1126 claimed that she had a prescription from her

medical provider for a companion animal, which she needed to help with a disability. *Id.*

The assistant manager informed Tester 1126 that a prescription would not be sufficient.

*Id.* ¶ 76. The assistant manager said that she would have to speak to the medical provider

to verify the need for the animal. *Id.* When Tester 1126 claimed that the medical

provider was working on rescue efforts in Puerto Rico and could not be reached, the

apartment manager said that River Quarry could not verify the need for a companion

animal via the doctor's staff and would have to speak to the doctor personally. *Id.*

The second tester, Tester 011696, called River Quarry and spoke to the same assistant manager. *Id.* ¶ 77. Tester 011696 did not disclose the existence of any disabilities. *Id.* The assistant manager "did not state any conditions under which River Quarry would ask to speak to Tester 011696's medical provider." *Id.*

**3.    Allegations Related to Defendant Kirk Cullimore**

The final category of allegations in the amended complaint are those relating solely to defendant Kirk Cullimore. *See Am. Compl.* ¶¶ 19-30. These allegations are contained under two headings, captioned: "Kirk Cullimore, Sr. campaigns against people with disabilities who exercise their rights under the Fair Housing Act," and "Cullimore creates forms and procedures that are intended to confuse applicants with disabilities and discourage them from requesting accommodations." *Id.* at 7-8. Within these sections, plaintiffs allege that Kirk Cullimore is an attorney; he specializes in evictions and fair housing defense; he has lectured at numerous conferences and events hosted by apartment associations; at one of those lectures, he claimed that "at least 50% of all requests for assistance animals are fraudulent," referred to support animals in rental housing as a "plague," and added "We've allowed it to happen because we haven't taken action to help stop the problem." *Id.* ¶ 24. Plaintiffs further allege that Mr. Cullimore advises housing providers to refuse disability documentation without a follow-up call to the signing medical professional. *Id.* ¶ 25. He has said these follow-up calls might make medical providers "Think about it, and not sign every stupid request that comes in front of them." *Id.*

## GOVERNING LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While a complaint attacked by a Rule 12(b)(6) motion to dismiss "does not need detailed factual allegations," it must set forth "more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Id.*

The Supreme Court identified two "working principles" that underlie *Twombly* in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). First, the court need not accept legal conclusions that are couched as factual allegations as true; the trial court "can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id*. at 679. Rule 8 does not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678-79. Second, to survive a motion to dismiss, a complaint must state a plausible claim for relief. *Id.* at 679. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

## ANALYSIS

### 1.      Fair Housing Act Claims

Plaintiffs allege a single claim under the Fair Housing Act. *Am. Compl.*, Dkt. 32, at 24. Within that claim, plaintiffs allege that "Defendants injured Plaintiffs by

committing discriminatory housing practices, including interference with Plaintiffs' fair housing rights, in violation of the Fair Housing Act, 42 U.S.C. § 3604(c) and (f) and § 3617." *Id.* ¶ 86. Generally, § 3604(f) of the Fair Housing Act prohibits housing providers from failing to reasonably accommodate a disability; § 3604(c) deals with discriminatory statements; and § 3617 deals with coercion, intimidation, threats, or interference.

### A.     Denial

Turning first to the plaintiffs' claim that defendants failed to reasonably accommodate Mr. LaRosa's disability, the FHA forbids discrimination in the rental of housing, including "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling[.]" 42 U.S.C. § 3604(f)(3)(B). To prevail on a § 3604(f)(3) claim for failure to make a reasonable accommodation, a plaintiff must prove (1) that the plaintiff is handicapped; [2] (2) that the defendant knew or should reasonably be expected to know of the handicap; (3) that accommodation of the handicap may be necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling; (4) that the accommodation is reasonable; and (5) that defendant refused to make the requested accommodation. *Dubois v. Ass'n of Apartment Owners of 2987 Kalakaua*, 453 F.3d 1175, 1179 (9th Cir. 2006). For the reasons explained below, plaintiffs' denial claim under § 3604(f) fails because they have not sufficiently alleged

---

[2] For the purposes of this decision, the terms "handicap" and "disability" are used interchangeably.

that defendants refused to make the requested accommodation.

The clearest violation of § 3604(f) occurs when a housing provider explicitly denies an accommodation request without good cause. Courts have found actual refusal of a request for an emotional support animal when a housing provider fines a tenant or gives notice of termination of tenancy based on the animal's presence. *See, e.g. Castellano v. Access Premier Realty, Inc.*, 181 F. Supp. 3d 798, 808 (E.D. Cal. 2016). But a housing provider does not deny an accommodation simply by requesting reliable information relating to a disability. More to the point, "[t]he FHA does not demand that housing providers immediately grant all requests for accommodation." *Bhogaita v. Altamonte Heights Condominium Ass'n, Inc.*, 765 F.3d 1277, 1281-83 (11th Cir. 2014) (citing, among other cases, *Prindable v. Ass'n of Apt. Owners of 2987 Kalakaua*, 304 F. Supp. 2d 1245, 1258 (D. Haw. 2003), *aff'd sub nom. DuBois v. Ass'n of Apt. Owners of 2987 Kalakaua*, 453 F.3d 1175 (9th Cir. 2006)). Rather, once a housing provider knows of an individual's request for accommodation, the provider has "'an opportunity to make a final decision . . . which necessarily includes the ability to conduct a meaningful review'" to determine whether the FHA requires the requested accommodation. *Id.* (quoting *Prindable*, 304 F. Supp. 2d at 1258).

Here, the LaRosas were formally granted an accommodation on October 13, 2017. They claim that before that time, the defendants wrongfully refused to accommodate them, thus violating the FHA. Previously, on these same facts, the Court concluded that no denial had occurred because even though the accommodation was not formally granted until October 13, 2017, Sid was allowed to live with the LaRosas in

their apartment from the date they moved in (September 19, 2017) through the date they moved out (February 16, 2018). The Court cited two cases supporting this result: (1) *Dubois v. Ass'n of Apartment Owners of 2987 Kalakaua*, 453 F.3d 1175 (9th Cir. 2006); and (2) *Overlook Mutual Homes, Inc. v. Spencer*, 415 Fed. App'x 617 (6th Cir. 2011) (unpublished decision). *See Order,* Dkt. 31, at 8-10.

In *Dubois v. Ass'n of Apartment Owners of 2987 Kalakaua*, 453 F.3d 1175 (9th Cir. 2006), plaintiffs Dubois and Prindable sought a variance on a condominium bylaw forbidding animals on the premises. *Id.* at 1177-78. The plaintiffs submitted letters recommending that one or the other be permitted to keep a dog for "medical reasons," with little explanation. *Id.* The condominium requested more information but granted plaintiffs temporary permission to keep the dog while submissions were being reviewed. *Id.* Before the condominium took any further action, plaintiffs sued. *Id.* The Ninth Circuit affirmed summary judgment in favor of the condominium, explaining that "[t]he Condominium Association never required [the dog] to leave and thus never refused to make the requested accommodation[.]" *Id.* at 1179.

In *Overlook Mutual Homes, Inc. v. Spencer*, 415 Fed. App'x 617 (6th Cir. 2011) (unpublished decision), the defendant housing corporation allowed the plaintiff and his pet to stay in the building while reviewing the accommodation request, even though the defendant never formally granted an exemption to the "no pets" policy during that time. *Id.* at 618. Despite the lack of a formal temporary exemption, the Sixth Circuit concluded "the more important fact is that [the dog] was allowed to stay with the family,

and they were never required to leave their home or otherwise punished for [the dog's] presence." *Id.* at 623.

As noted, Mr. LaRosa's dog was similarly allowed to reside with the LaRosas in their apartment while River Quarry reviewed the accommodation request. The LaRosas were not fined or otherwise punished for Sid's presence; they were not told to remove him; they did not have to pay the pet fee; and they were not told that they had to leave the apartment building. The Court thus sees no reason to change its earlier ruling on this point.

In amending their complaint, the LaRosas have not added new factual allegations that support a plausible refusal-to-accommodate claim. Plaintiffs do, however, highlight a previously alleged fact – that on October 3, 2017, ten days before the accommodation was formally granted, Defendant Deanne Pirnie wrote a letter to the LaRosas stating, "we cannot grant the requested accommodation" and that "[y]ou can come into the office and apply to have a pet addendum . . . . Of course, there are fees, deposits and rent that will be required for a pet." *See Am. Compl.*, Dkt 32, ¶ 60. Plaintiffs contend that defendants violated the FHA the moment Pirnie wrote the letter. *See generally Bryant Woods Inn v. Howard Cnty.*, 124 F.3d 597, 602 (4th Cir. 1997) ("Under the Fair Housing Act . . . a violation occurs when the disabled resident is first denied a reasonable accommodation, irrespective of the remedies granted in subsequent proceedings."). The problem with this argument is that as of October 3 – the date Pirnie wrote the letter – River Quarry had the letter from Dr. Wilper in hand, but that letter was equivocal. It stated:

I am familiar with your history and with the functional and coping
limitations imposed by your emotional/mental health-related issues. In my
opinion, an emotional support animal *may help* mitigate the symptoms you
are currently experiencing.

*Am. Compl.,* Dkt. 32, ¶ 46 (emphasis added). Additionally, the day before Ms. Pirnie

sent the letter, Mr. Cullimore spoke to Dr. Wilper by telephone. The details of that

conversation are described above, but the critical point is that during the conversation,

Dr. Wilper did not affirmatively say Mr. LaRosa needed an emotional support dog to

ameliorate the effects of his disability. Rather, Dr. Wilper confirmed that Mr. LaRosa

had a disability, and otherwise stated that he planned to follow up with Mr. Cullimore

after he had an October 4, 2017 appointment with Mr. LaRosa. *See id.* ¶ 59. Thus, on

October 3, 2017, when Deanne Pirnie wrote the letter, River Quarry did not have

sufficient information to determine that Mr. LaRosa needed a support animal to

accommodate a disability.

Plaintiffs' insistence that River Quarry was obligated to immediately grant an

accommodation at that point (*i.e.,* after Mr. Cullimore spoke to Dr. Wilper), or at earlier

points (*i.e.,* upon River Quarry's earlier receipt of letters from Dr. Wilper or Nurse

Practitioner Hill) rests on the flawed premise that a housing provider must immediately

grant an accommodation request, without any opportunity to evaluate the request. As

explained above, governing law contemplates that the housing provider will have a

meaningful opportunity to investigate a request for an accommodation. Further, the

Court is not persuaded by plaintiffs' arguments that the defendants ran afoul of the Joint

Statement issued by HUD and DOJ. *See* HUD/DOJ Joint Statement (available at

https://www.hud.gov/sites/documents/huddojstatement.pdf) (last visited August 2, 2019). First, the Joint Statement does not warrant *Chevron* deference; it is a policy statement that is entitled to respect to the extent is has the power to persuade. *See, e.g., Bhogaita v. Altamonte Heights Condo. Ass'n*, 765 F.3d 1277, 1286 n.3 (11th Cir. 2014). Second, the Joint Statement contemplates an interactive process; it does not contemplate that housing providers must *immediately* grant requests for accommodation. *See Joint Statement,* ¶ 18.

Finally, the Court will address paragraph 60 of the amended complaint. This is a new allegation, which characterizes that October 2, 2017 conversation between Dr. Wilper and Mr. Cullimore as follows:

> At no time during Cullimore's call with Dr. Wilper did Dr. Wilper indicate either that (1) Mr. LaRosa did not have a disability within the meaning of the Fair Housing Act, or (2) Mr. LaRosa did not need Sid to ameliorate the effects of his disability. At no time during the call did Dr Wilper indicate that Mr. LaRosa did not qualify for an accommodation, or that the medical verification was anything but genuine.

*Am. Compl.*, Dkt. 32, ¶ 60. This new paragraph, which is primarily a string of negatives, does not help plaintiffs build their denial claim. For purposes of evaluating the denial claim, the important question is what Dr. Wilper said during that conversation – not what he didn't say. Said differently, this new allegation does not change the fact that during the October 2, 2017 conversation, Dr. Wilper did not affirm that Mr. LaRosa needed a support dog to ameliorate the effects of his disability. That question was to be addressed later, after Dr. Wilper met with Mr. LaRosa. Further, as already noted, Sid continued to live in the apartment with the LaRosas until the accommodation request

was approved ten days later, on October 13. The "fees, deposits and rent" were never enforced against the LaRosas and no other actions were initiated against them for Sid's presence. Under these circumstances, plaintiffs have not alleged a denial claim under the § 3604(f) of the FHA.

## B. Constructive Denial

Likewise, plaintiffs have not sufficiently alleged a constructive denial claim under § 3604(f). A defendant constructively denies an accommodation request when an unjustified and indeterminate delay has the same effect of undermining the FHA's anti-discriminatory purpose as a formal denial. *Groome Resources, Ltd. v. Parish of Jefferson*, 234 F.3d 192, 199-200 (5th Cir. 2000). According to DOJ/HUD Joint Statement, a housing provider is obligated to "provide prompt responses to reasonable accommodation requests" and an "undue delay . . . may be deemed to be a failure to provide a reasonable accommodation." Joint Statement at 11, ¶ 15.

As the Court has previously explained, in constructive denial cases, an applicant is typically left in limbo for a lengthy period while the housing provider stonewalls. In *Bhogaita v. Altamonte Heights Condominium Ass'n, Inc.*, 756 F.3d 1277, 1281-83 (11th Cir. 2014), a condominium association sat on a reasonable accommodation request for six months. The association had all the information necessary for a determination: a doctor's letters "described the nature and cause of Bhogaita's PTSD diagnosis, stated that Bhogaita was substantially impaired in the major life activity of working, and explained that the dog alleviated Bhogaita's symptoms." *Id.* at 1286-87. After receiving these letters, the association continued to request the same information, as well as

extraneous information. *Id.* at 1287. The extraneous information sought included

"additional information regarding Bhogaita's treatment, medications, and the number of

counseling sessions he attended per week; details about how the diagnosis was made;

whether the condition was permanent or temporary; and 'details of the prescribed

treatment moving forward.'" *Id.* at 1287. Because the association had not responded to

Bhogaita's accommodation request for over six months other than to request additional

information, the Eleventh Circuit held that Bhogaita's request had been constructively

denied. *Id.* at 1286.

Plaintiffs claim that River Quarry had all the information necessary to grant the

requested accommodation, and that further requests for information constituted

constructive denial. But unlike *Bhogaita*, where a determination was delayed for six

months, the LaRosas' accommodation request was granted in 45 days. *See also*

*Prindable,* 304 F. Supp. 2d at 1259 ("Nor is a period of less than two months from the

first request for an accommodation an 'indeterminate' delay under the circumstances.").

River Quarry also did not have sufficient information to come to a meaningful decision

until Dr. Wilper completed the "Verification for Assistance Animal" form, at which

point the LaRosas' request was granted.

Plaintiffs argue that River Quarry had sufficient information to make a final

determination at two points prior to submission of the "Verification for Assistance

Animal" form: first, with the submission of the 2016 nurse practitioner's note, and

second, with the submission of Dr. Wilper's September 17 letter. The Court is not

persuaded.

First, the nurse practitioner's note was approximately one year old when the LaRosas submitted it to River Quarry. This Court does not agree that a housing provider must accept a dated letter without question. Under such a theory, any attempt to contact a current medical-care provider or to verify the contents of a letter would amount to constructive denial. The case law does not support such a result.

Second, Dr. Wilper's September 17 letter, although current, lacked information necessary for River Quarry to make a final determination. As already discussed, Dr. Wilper's letter stated that Mr. LaRosa had "emotional/mental health related issues" and that "an emotional support animal *may* help mitigate the symptoms you are currently experiencing." *Am. Compl.*, Dkt. 32, ¶ 46 (emphasis added). In *Dubois*, the Ninth Circuit found that a housing provider could seek additional information after receiving a doctor's letter recommending a dog be kept for "medical reasons" with little explanation. 453 F.3d at 1178. Similarly, River Quarry was entitled to seek more specific information in allowing them to determine that Mr. LaRosa suffered from a disability as defined by the FHA, that an emotional support animal was a needed accommodation, and that there was a relationship between the disability and the accommodation.

Thus, despite the amendments, plaintiffs still fail to allege that River Quarry actually or constructively denied their accommodation request. The Court will therefore dismiss the § 3604(f) claim.

### C.    Disparate Treatment

Additionally, to the extent plaintiffs are pursuing a disparate-treatment claim under § 42 U.S.C. § 3604(f), the Court will dismiss such a claim. As a general rule, plaintiffs alleging a violation of 3604(f) proceed under one of three theories: disparate treatment; disparate impact; and failure to make reasonable accommodations. *See, e.g., Budnick v. Town of Carefree*, 518 F.3d 1109, 1112 (9th Cir. 2008). The amended complaint clearly shows that plaintiffs were alleging a failure-to-accommodate claim under § 3604(f), as well as an interference claim under § 3617. But the intended parameters of a disparate-treatment claim under § 3604(f) are not clearly stated. That is, although the body of the complaint very generally refers to various different theories, plaintiffs ultimately allege a single FHA claim, captioned, "First Cause of Action (Fair Housing Act, 42 U.S.C. 3601 *et seq.*)" *Am. Compl.*, Dkt. 32, ¶¶ 85-86. Then, when it comes time to clarify the theories of liability, plaintiffs simply "repeat and re-allege" the entire complaint, followed by this statement: "Defendants injured Plaintiffs by committing discriminatory housing practices, including interference with Plaintiff's fair housing rights, in violation of the Fair Housing Act, 42 U.S.C. §§ 3604(c) and (f), and 3617." *Id.* ¶ 86.

Presumably in an effort to establish a disparate-treatment claim, plaintiff IHFC sent testers to River Quarry to pose as potential tenants. One claimed to have a prescription for a companion animal; the other did not. *See Am. Compl.*, Dkt. 32, ¶¶ 74-77. The Court previously concluded that these allegations did not support plaintiffs'

alleged claims, and plaintiffs have not added any new factual allegations relating to the testers. Accordingly, that claim will be dismissed.

### D.     Interference – 42 U.S.C. § 3617

Turning to plaintiffs' interference claim under 42 U.S.C. § 3617, the Court will deny the motions to dismiss this claim. Section 3617 provides that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of . . . any right granted or protected by sections 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. § 3617. A § 3617 claim may arise in a situation where no underlying discriminatory housing practice occurred. *United States v. City of Hayward*, 36 F.3d 832, 836 (9th Cir. 1994). The Ninth Circuit has held that "interference" is to be "broadly applied to reach all practices which have the effect of interfering with the exercise of rights under the federal fair housing laws." *Id.* at 835. Interference is further defined as "the act of meddling in or hampering an activity or process." *Walker v. City of Lakewood*, 272 F.3d 1114, 1129 (9th Cir. 2001) (citing *Webster's Third New Int'l Dict.* 1178 (14th ed. 1961)). To establish a prima facie case under § 3617, a plaintiff must show that (1) he engaged in a protected activity; (2) the defendant subjected him to an adverse action; and (3) a causal link exists between the protected activity and the adverse action. *Id.* at 1128.

Regarding the first element, the LaRosas engaged in a protected activity when they applied for a reasonable accommodation. For a disabled individual to seek an accommodation, they must be allowed to apply; in fact, plaintiffs must apply (or attempt to apply) for a reasonable accommodation before they can bring a claim for violation of

the FHA. *Astralis Condo. Ass'n v. Sec'y, U.S. Dep't of Hous. & Urban Dev.*, 620 F.3d 62, 67 (1st Cir. 2010) ("[C]laimant must show that he requested a particular accommodation . . . .").

On the second and third elements, Plaintiffs sufficiently allege that they were subjected to an adverse action and that a causal link exists between the protected activity and the adverse action. Significantly, plaintiffs now allege that, during the verification process, the defendants misrepresented the contents of Mr. Cullimore and Dr. Wilper's October 2, 2017 conversation. As already discussed, the upshot of that conversation was that Dr. Wilper: (a) verified that Mr. LaRosa had a disability; but (b) otherwise indicated that he would follow up with Mr. Cullimore after his next appointment with Mr. LaRosa. *See Am. Comp.*, Dkt. 32, ¶¶ 56-59. But that is not what River Quarry told the LaRosas. Instead of saying that the verification process was still underway and that they expected further information, River Quarry told the LaRosas that: "Our most recent discussion with . . . [Dr. Wilper] has determined that you do not qualify under the Fair Housing Act for this accommodation. This determination was made by your medical provider." *Id.* ¶ 60. In other words, River Quarry omitted critical information – that Dr. Wilper intended to get back to Mr. Cullimore. Plaintiffs allege that this omission was made for the purpose of misleading the LaRosas and discouraging them from exercising their rights under the FHA. *Id.* ¶ 61. Additionally, plaintiffs allege that Mr. Cullimore's calls to Dr. Wilper's office constituted attempts to dissuade Dr. Wilper from signing off on Mr. LaRosa's need for an emotional support animal. *See, e.g., id.* ¶ 58.

Under the Ninth Circuit's broad interpretation of "interference," plaintiffs have

sufficiently stated a claim for interference under § 3617. Accordingly, the Court will deny defendants' motion to dismiss that aspect of the FHA claim.

### E.    Discriminatory Statements – 42 U.S.C. § 3604(c)

The Court will also dismiss plaintiffs' claim for discriminatory statements under 42 U.S.C. § 3604(c). Under the FHA, it is unlawful to "make, print or publish . . . any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on . . . handicap . . . or an intention to make any such preference, limitation, or discrimination." 42 U.S.C. § 3604(c). These prohibitions apply to "person[s] engaged in the sale or rental of a dwelling." 24 C.F.R. § 100.75(b).

The Court dismissed plaintiffs' § 3604(c) claim earlier, and plaintiffs have not pointed to new or different allegations that would persuade the Court to allow the claim to proceed. In fact, plaintiffs barely even discuss the § 3604(c) claim in their oppositions to the pending motions to dismiss. To be sure, plaintiffs now allege that defendant Kirk Cullimore made various discriminatory statements in speeches and lectures. But Mr. Cullimore is an attorney; he is not a "person engaged in the sale or rental of a dwelling," 24 C.F.R. § 100.75(b). Perhaps for that reason, plaintiffs do not argue that the statements Mr. Cullimore made during those speeches would support their claim under § 3604(c). Under these circumstances, including plaintiffs' lack of meaningful opposition, the Court will grant defendants' motions to dismiss the § 3604(c) claim.

### 2.    Negligence

The parties agree that plaintiffs' negligence claim is derivative of the FHA claim.

Accordingly, to the extent the negligence claim is predicated on the remaining FHA claim, that claim may proceed.

## 3. Invasion of Privacy

In Idaho, a claim for invasion of privacy requires: (1) an intentional intrusion by the defendant; (2) into a matter, which the plaintiff has a right to keep private; (3) by the use of a method, which is objectionable to the reasonable person. *Jensen v. State*, 72 P.3d 897, 902 (Idaho 2003). Because the right of privacy is measured by an objective standard, "[t]he right of privacy is relative to the customs of the time and place, and is determined by the norm of the ordinary person." *Id.* (citation omitted). Thus, "in order to constitute an invasion of privacy, an act must be of such a nature as a reasonable person can see might and probably would cause mental distress and injury to anyone possessed of ordinary feelings and intelligences, situated in like circumstances as the plaintiff." *Id.* Further, it is not necessary to prove the presence of malice, and consent is a complete defense. *Id.* (citations omitted).

In their complaint, Plaintiffs allege that the LaRosas signed a release for River Quarry to speak to Dr. Wilper about the contents of Dr. Wilper's September 17 letter. The purpose of this release was to allow Defendants the opportunity to discuss Mr. LaRosa's disability and need for accommodation, information which a housing provider is entitled to under HUD guidelines. *Joint Statement* ¶ 18. Mr. Cullimore's conversations with Dr. Wilper related to the purpose for which Mr. LaRosa had granted consent. This Court will therefore dismiss the invasion of privacy claim.

**ORDER**

**IT IS HEREBY ORDERED that:**

1)  Defendants River Quarry Apartments, LLC, Rafanelli & Nahas Management Corporation, and Deanne Pirnie's renewed Motion to Dismiss (Dkt. 33) is **GRANTED IN PART AND DENIED IN PART**.

2)  Motion to Dismiss Claims Against Defendants Law Offices of Kirk A. Cullimore and Kirk Cullimore (Dkt. 34) is **GRANTED IN PART AND DENIED IN PART**.

DATED: August 3, 2019

_____
B. Lynn Winmill
U.S. District Court Judge